UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

LAUREN IACOBUCCI,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 1:14-CV-00126-GWC

**OPINION AND ORDER**
(Docs. 15, 17)

    Plaintiff Lauren Iacobucci brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income ("SSI"). Pending before the court are the parties' motions for judgment on the pleadings. For the reasons stated below, the court GRANTS Iacobucci's motion, DENIES the Commissioner's motion, and REMANDS for further proceedings and a new decision.

**I.    Background**

    Lauren Iacobucci was twenty-one years old on her amended alleged disability onset date of June 25, 2011.[1] Iacobucci has been diagnosed with adjustment disorder, depressive disorder, and generalized anxiety disorder (AR 284, 295, 355.) She has a high school education, but struggled in school due to her learning disability. She lives in a house with her mother, three other adult family members, and her young son. (AR 157.)

    Iacobucci was classified as learning disabled through all four years of high school. (AR 209-39.) She generally received average or below average grades, and she needed special

---

[1] Iacobucci initially alleged an onset date of September 4, 1989—her date of birth—and subsequently amended it to June 25, 2011. (AR 33.)

1

education services in English and math. (AR 212.) Her full scale IQ is in the borderline range, measured at 71 and 73. (AR 215.) Iacobucci enrolled in community college, but dropped out before she had completed one semester because she felt overwhelmed and became pregnant. (AR 34.)

Iacobucci first sought treatment for depression on March 9, 2009, when she presented to the Erie County Medical Center with a complaint of depression. (AR 277.) She stated that she had been feeling depressed for the previous several months and that she slept ten to twelve hours per night. (*Id.*) The attending physician diagnosed her with adjustment disorder and depressive mood, and assessed her GAF score at 41-50. (AR 284.) Iacobucci was referred to mental health counseling. (AR 283.)

On May 5, 2011, Iacobucci was examined by agency consulting psychologist Gregory Fabiano, Ph.D. Iacobucci complained of depression, fatigue, loss of interest, and social withdrawal. (AR 293.) Dr. Fabiano noted that Iacobucci was casually dressed and well-groomed, spoke clearly, exhibited coherent thought processes, displayed appropriate affect, and was euthymic in mood. (AR 293-94.) He further noted that she reported having friends, hobbies, and interests. (AR 294-95.) Dr. Fabiano diagnosed her with depressive disorder, but concluded that she could manage complex tasks and that her depression was not significant enough to interfere with her daily functioning. (AR 295.) On June 7, 2011, agency consulting psychiatrist H. Tzetzo reviewed the record evidence and concurred with Dr. Fabiano's assessment. (AR 309.) Dr. Tzetzo concluded that Iacobucci's psychiatric impairments impacted her functioning only minimally. (*Id.*)

Iacobucci periodically sought treatment for her depression throughout 2011. (AR 343-49.) She was encouraged to exercise, referred to counseling, and prescribed various medicines to combat her depression and anxiety, including Zoloft, Melatonin, Atenolol, Klonopin, and Zyrtec. (AR 343-44.)

On January 24, 2012, Iacobucci began treating with psychiatrist Wendy Weinstein, M.D. After an initial psychiatric evaluation, Dr. Weinstein noted that Iacobucci was cooperative, clear and coherent; displayed appropriate affect; had goal-directed thought processes and fair insight and judgment; and was within normal cognitive limits. (AR 353.) Dr. Weinstein observed that

Iacobucci's mood was depressed, and diagnosed her with recurrent major depression and generalized anxiety disorder. (*Id.*) Dr. Weinstein concluded that Iacobucci suffered from "prominent symptoms of depression which appear[ed] to be affecting her functioning." (*Id.*) She noted that Iacobucci was "unable to focus, concentrate, or be motivated," and indicated her concern that Iacobucci's depression would worsen after her baby was born. (*Id.*) Dr. Weinstein prescribed Lexapro. (*Id.*) Iacobucci treated with Dr. Weinstein roughly monthly, and had met with her a total of six times before Iacobucci's hearing occurred and the medical record was closed. Dr. Weinstein's treatment notes indicate recurring depression, and she continually increased Iacobucci's medication and introduced new medications, such as Celexa and Abilify. (AR 354-58.) Dr. Weinstein also noted that Iacobucci reported feeling overwhelmed and anxious after the birth of her son. (AR 356, 358.)

Iacobucci has worked as a summer youth program counselor, a cashier at a pharmacy and grocery store, and a cafeteria worker at a middle school. (AR 149.) She stopped working on June 25, 2011 because of her depression.

Iacobucci protectively filed for disability benefits and SSI on February 28, 2011, claiming her depression, anxiety, and learning disability prevented her from working.[2] (AR 117-30.) Her applications were denied, and a hearing was held on September 24, 2012, before Administrative Law Judge ("ALJ") David Lewandowski. (AR 30.) Iacobucci appeared and testified, and was represented by an attorney. (*Id.*) A vocational expert ("VE") also testified at the hearing. (AR 52-56.)

At the hearing, Iacobucci testified to her persistent depression, anxiety, and paranoia. (AR 41-44.) She testified that she starts shaking and cries for twenty-minute periods due to her anxiety. (AR 43.) She also stated that she receives help from her mother in caring for her son,

---

[2] If a claimant files a written statement with the Social Security Administration "indicat[ing] an intent to claim benefits," then the Commissioner "will use the filing date of the written statement as the filing date of the application." 20 C.F.R. § 404.630. This is known as protective filing, because SSI benefits are not payable prior to the month following the month in which the application was filed. 20 C.F.R. § 416.335. In this case, the fact that Iacobucci protectively filed on February 28, 2011 became irrelevant when she amended her alleged disability onset date to June 25, 2011.

3

which she finds overwhelming. (AR 51.) Iacobucci mostly stays at her home and rarely leaves the house or socializes. (AR 48-49.)

The ALJ issued an unfavorable decision on October 25, 2012. (AR 15-23.) The Appeals Council denied Iacobucci's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1.) Iacobucci appealed to this court on February 24, 2014. (Doc. 1.)

## II.     The ALJ's Decision

"Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant will be found disabled only if it is determined that her "impairments are of such severity that [s]he is not only unable to do h[er] previous work[,] but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In evaluating disability claims the Commissioner uses a five-step procedure. *See Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). At step one the ALJ must determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If she is not, step two requires the ALJ to determine whether she has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, at step three he determines whether the severe impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is presumptively disabled. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984.)

If the claimant is not presumptively disabled, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the most the claimant can do in a work setting despite her limitations based on the relevant evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the ALJ considers whether the claimant's RFC precludes the performance of her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). At the fifth and final step, the ALJ determines whether the claimant can do "any

4

other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proof in the first four steps; at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

The ALJ first determined that Iacobucci met the insured status requirements for disability benefits through June 30, 2012. (AR 15.) Employing the five-step procedure, the ALJ determined that Iacobucci had not engaged in any substantial gainful activity since her amended alleged disability onset date of June 25, 2011. (AR 17.) At step two, the ALJ found that Iacobucci had the following severe impairments: "learning disability, depressive disorder, anxiety disorder, and paranoid disorder." (*Id.*) At step three, the ALJ found that Iacobucci did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listings. (AR 18.)

> The ALJ then found that:
>
> [Iacobucci] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is able to understand, remember and carry out simple instructions, perform simple routine repetitive tasks; requires a regular simple schedule; occasionally make simple decisions; avoid []fast pace, production rate; requires no or limited proximity to coworkers with occasional interaction with others; and limited to no more than basic reading or math skills.

(AR 19.) The ALJ found that Iacobucci was unable to perform any of her past relevant work. (AR 22.) The ALJ then concluded based on Iacobucci's RFC and on the VE's testimony that there are other jobs in significant numbers in the national economy that Iacobucci could perform, such as laundry worker, warehouse worker, and packaging machine operator/tender. (AR 23.) Finally, the ALJ concluded that Iacobucci had not been under a disability from her protective filing date through October 25, 2012, the date of his decision.[3] (AR 19.)

---

[3] That the ALJ found Iacobucci had not been under a disability from her protective filing date, rather than from her amended alleged disability onset date, is irrelevant for purposes of the court's review.

### III. Standard of Review

This court reviews "the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard."[4] *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). The court should keep in mind "the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

### IV. Analysis and Conclusions

Iacobucci argues that the ALJ erred by failing to adequately develop the medical record. Iacobucci further contends that the ALJ's determination of her credibility is not supported by substantial evidence.

#### A. The ALJ's Duty to Develop the Record

Because the disability hearing is non-adversarial, the ALJ has an affirmative duty to develop the record "for at least a twelve-month period if there was reason to believe that the information was necessary to reach a decision." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *see also* 20 C.F.R. § 416.912(d)(2). The Commissioner is obligated to seek out additional evidence, however, only where there are "obvious gaps" in the record. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

Iacobucci argues that the ALJ should have requested and obtained an opinion from Dr. Weinstein, her treating psychiatrist. (Doc. 15-1 at 14-17.) Treating physicians provide useful

---

[4] The standard of review is the same for SSI and Social Security disability cases, and the same case law is applicable to both kinds of benefits. *See* 42 U.S.C. § 1383(c)(3).

6

information to the Commissioner, because they are the medical sources "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). The record contains no opinion from Dr. Weinstein, and there is no evidence that the ALJ requested one. The Commissioner responds that the ALJ was not required to solicit a treating physician opinion in this case because Dr. Weinstein was not a treating source and because the ALJ made his disability determination with the benefit of Dr. Weinstein's treatment notes as well as agency consultative opinions. (Doc. 17-1 at 19-20.)

To determine whether a physician is a treating source, courts look primarily to "the nature of the relationship between the physician and the claimant," in addition to secondary factors such as length of the treating relationship. *Schisler v. Sullivan*, 3 F.3d 563, 566 (2d Cir. 1993).

Dr. Weinstein established a treating relationship with Iacobucci. Dr. Weinstein had treated Iacobucci six times at regular intervals by the time of Iacobucci's hearing; diagnosed Iacobucci with recurrent major depression and generalized anxiety disorder; prescribed medications to treat Iacobucci's disorders; and altered the type and dosages of medications as the treating relationship progressed. *See Harrison v. Sec'y of Health & Human Servs.*, 901 F. Supp. 749, 755 (S.D.N.Y. 1995) (concluding physician was treating source where claimant saw physician four times over five-month period and physician diagnosed claimant and provided referrals for treatment).

"[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (Summary Order); *see also* 20 C.F.R. § 1513(b)(6) ("Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete."). In this case, however, there was an "obvious gap" in the record because the record contains no treating physician opinions. *See Swanson v. Colvin*, No. 12-CV-645S, 2013 WL 5676028, at *5 (W.D.N.Y. Oct. 17, 2013)

(remanding for failure to develop the record where ALJ "fail[ed] to obtain an RFC assessment from any treating source"); *cf. Tankisi*, 521 F. App'x at 34 (concluding ALJ's failure to request treating physician opinion did not require remand because, *inter alia*, medical record contained another treating source opinion).

A medical source statement from Dr. Weinstein would be particularly useful in determining Iacobucci's non-exertional limitations because Iacobucci obtained the bulk of her depression and anxiety treatment from Dr. Weinstein, with whom she met more regularly and for a longer period of time than any other medical provider in the record for those conditions. (AR 351-58.) Dr. Weinstein's opinion would also be particularly useful because the two other medical opinions in the record—both from agency consulting physicians—predate the start of Iacobucci's treatment with Dr. Weinstein, whose treatment notes indicate that Iacobucci's symptoms had likely worsened by that point. Given the lack of treating source opinions in the record as well as the relatively extensive treating relationship for depression between Iacobucci and Dr. Weinstein, the ALJ's failure to request an opinion from Dr. Weinstein constitutes reversible error. On remand, the ALJ is instructed to request a medical source statement from Dr. Weinstein and consider it according to the standards set forth at 20 C.F.R. § 404.1527(c) in making the disability determination.

## B. The ALJ's Credibility Determination

Iacobucci further argues that the ALJ did not apply the appropriate standards in assessing her credibility regarding the extent of her depression and anxiety symptoms. (Doc. 15-1 at 18-28.)

"In determining whether [a claimant] is disabled, [the ALJ] consider[s] all [the claimant's] symptoms . . . and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 1529(a). The ALJ concluded that Iacobucci's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Iacobucci's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" his RFC assessment. (AR 20.)

Iacobucci takes issue with the ALJ's reliance on the fact that she had a four-month-old son at the time of the hearing in finding the extent of her alleged symptoms incredible. The ALJ found it "relevant . . . that [Iacobucci] became pregnant after she allege[d] becoming disabled and is now the primary caregiver for her four-month old son." (AR 21.) The ALJ observed that "[i]n order to properly care for her child and insure his safety, the claimant is required to demonstrate at least as much capacity for sustained concentration and attention, and ability to perform simple tasks as was required by her past work as a cashier." (*Id.*) The ALJ concluded that Iacobucci's "willingness and ability to undertake the mentally (and physically) arduous task of childrearing is consistent with her ability to perform simple tasks." (*Id.*)

Iacobucci correctly argues that the ALJ's conclusion is not supported by substantial evidence. First, the court sees no relevance to the timing of Iacobucci's pregnancy. The evidence shows that Iacobucci's pregnancy and childbirth occurred incidental to her mental symptoms, and not in spite of them. Iacobucci's motherhood therefore is not relevant to determining how severe her symptoms are and should not affect the ALJ's credibility analysis.

Additionally, the ALJ's conclusion that Iacobucci, as the child's primary caregiver, was necessarily competent to work was misguided in two respects. First, the ALJ concluded that Iacobucci was the child's primary caregiver without addressing the extensive evidence that the child's primary caregiver may have been Iacobucci's mother. Dr. Weinstein's treatment notes reflect the anxiety Iacobucci felt during pregnancy about how she would take care of her baby, as well as her feeling overwhelmed and anxious after the baby arrived. (AR 354-58.) Dr. Weinstein noted that Iacobucci said her mother was helping her "a lot" with the baby. (AR 358.) At the hearing, Iacobucci referred to herself as a "single mother" and stated she had to "do it all on [her] own." (AR 41.) However, she also stated: "[I]f it wasn't for my mom I just wouldn't know what to do with me and my son." (*Id.*) Iacobucci testified that her mother took over her son's care when she got "frustrated," which led to her mother taking care of him "more than" she was. (AR 56.)

The ALJ's decision failed to cite any evidence concerning Iacobucci's mother's involvement in raising the child except for a single mention that Iacobucci told Dr. Weinstein that her mother helped with the baby. (AR 20.) Iacobucci's mother's role in childrearing is absent from the remainder of the decision, noticeably so in the ALJ's discussion of Iacobucci's

9

childcare activities. Because the ALJ's decision does not discuss Iacobucci's mother's role in relieving Iacobucci of many of her childcare duties, the court is unable to comfortably identify the ALJ's rationale in concluding that Iacobucci successfully performed all of the activities of a primary childcare provider. *Cf. Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [he is] not require[d] [to] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."). The ALJ's conclusion that Iacobucci was her child's primary caretaker is not supported by substantial evidence to the extent it does not acknowledge the significant amount of evidence that Iacobucci's mother took an active and perhaps primary role in caring for Iacobucci's child.

The extent of Iacobucci's childcare duties is relevant because the ALJ drew a parallel between the ability to primarily care for a child and the ability to work. While an individual's ability to care for children may serve as evidence that she does not face certain limitations, *see Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009), Iacobucci's status as the child's mother alone is not evidence of non-disability. *See Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005). Rather, the fact that an individual has a child is probative of non-disability only to the extent the record shows that she engages in childrearing activities indicative of an ability to engage in substantial gainful activity. *See* Social Security Ruling 96-7p ("The determination or decision must contain specific reasons for the finding on credibility, *supported by the evidence in the case record* . . . .") (emphasis added). Here, the ALJ: recognized that caring for an infant involves a substantial amount of work; inferred, by virtue of the fact that Iacobucci gave birth to the child, that she successfully performed that work; and concluded that she therefore possessed the mental capacity to engage in substantial gainful activity. The ALJ erred in allowing Iacobucci's status as the mother of a four-month-old infant at the time of the hearing—rather than the record evidence and testimony—to guide his determination of Iacobucci's RFC and non-disability.[5]

---

[5] The court also notes that the ALJ's conclusion that Iacobucci demonstrated, as the mother of an infant, "at least as much capacity . . . as was required by her past work as a cashier" is inconsistent with his conclusion that she could not perform any of her past relevant work. (AR 21, 22.)

10

Iacobucci next argues that it was error for the ALJ to diminish her credibility based on her description of her child's sleeping habits. (Doc. 15-1 at 22-24.) At the hearing, Iacobucci testified that her son awoke around 6:30 am, and took 15-minute naps every two hours throughout the day. (AR 57.) The ALJ concluded that no "reasonabl[e]" four-month old would keep those hours. (AR 21.) He found that Iacobucci's testimony concerning how often she became frustrated with her son was not credible because he believed her son was asleep for longer periods of time than she described. The ALJ cited no evidence to support his belief concerning the sleeping patterns of infants. It was error for the ALJ to conclude that Iacobucci's description of her child's sleeping habits was impossible without citing to competent medical authority. *See Rosa*, 335 F.3d at 78-79 ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (quotations omitted). On remand, the ALJ should not base his credibility finding on the amount of sleep a four-month old "reasonably" needs without the benefit of supporting medical evidence.

Because the court remands for further proceedings and a new decision, it need not address Iacobucci's remaining arguments that the ALJ's credibility determination was inadequate.

### V.     Conclusion

For the reasons stated above, Iacobucci's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion is DENIED. The court REMANDS the matter for further proceedings and a new decision consistent with this opinion.

Dated this 30th day of June, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court